Matthews v. Barr

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2017

(Argued:  May 9, 2018        Decided: June 18, 2019)

Docket No. 16-3145

_____

GERARD PATRICK MATTHEWS,

*Petitioner,*

- v. -

WILLIAM P. BARR, United States Attorney General,

*Respondent.*

_____

Before:

HALL and CARNEY, *Circuit Judges*, KOELTL, *District Judge*.[1]

Petitioner seeks review of a decision of the Board of Immigration Appeals, affirming a decision of an Immigration Judge that found Petitioner removable and denied Petitioner's applications for cancellation of removal and adjustment of status.  The agency determined that Petitioner's New York convictions for endangering the welfare of a child were crimes of child abuse, child neglect, or child abandonment under the Immigration and Nationality Act, and denied relief from removal as a matter of discretion.  Because we have previously upheld the determination of the Board of Immigration Appeals that child endangerment offenses fall within the Immigration and Nationality Act's crime of child abuse provision, and we agree that New York law—which criminalizes conduct that

---

[1] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

poses a likelihood of physical, mental, or moral harm to a child—falls within the BIA's definition, we DENY the petition.

Petition for review DENIED.

Judge Carney dissents in a separate opinion.

DAVID J. ZIMMER, Goodwin Procter LLP, Boston, MA (William M. Jay, Goodwin Procter LLP, Washington, D.C.; Seymour W. James, Jr., Attorney-in-Chief, Hasan Shafiqullah, Attorney-in Charge, Ward J. Oliver, Supervising Attorney, Immigration Law Unit, The Legal Aid Society, New York, NY, *on the brief*), *for Petitioner*.

SONG PARK, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division (Chad A. Readler, Acting Assistant Attorney General, Cindy S. Ferrier, Assistant Director, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent*.

ANDREW WACHTENHEIM, Immigrant Defense Project, New York, NY, *for Amici Curiae* Brooklyn Defender Services, Queens Law Associates, Neighborhood Defender Service of Harlem, The Bronx Defenders, Essex County Public Defender's Office, Monroe County Public Defender's Office, Immigrant Defense Project.

HALL, *CIRCUIT JUDGE*:

Petitioner Gerard Patrick Matthews seeks review of an August 2016 decision of the Board of Immigration Appeals ("BIA"), affirming an April 2016 decision of an Immigration Judge ("IJ") that ordered Matthews removed to Ireland on the ground that his convictions for endangering the welfare of a child under New York Penal Law ("NYPL") § 260.10(1) made him removable under Immigration and Nationality Act ("INA") § 237(a)(2)(E)(i), 8 U.S.C. § 1227(a)(2)(E)(i), which provides that "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse, child neglect, or child abandonment is deportable." Matthews argues that he is not removable because the New York statute of conviction is not categorically a crime of child abuse under the INA. First, he argues that the INA's definition of crime of child abuse requires that there be actual harm to a child, or at least a high risk of serious injury. He challenges the BIA's definition, which encompasses state child endangerment offenses that involve a sufficiently high risk of physical, mental, or moral harm to a child. Because we have deferred to the BIA's definition as a reasonable interpretation of the crime of child abuse provision in a precedential decision, *Florez v. Holder*, 779 F.3d 207 (2d Cir. 2015), and we find no basis for departing from that decision, we

3

reject Matthews's first argument and continue to apply the BIA's definition of crime of child abuse. Second, Matthews argues that the New York child endangerment law, NYPL § 260.10(1), stretches even further than the BIA's broad definition because the statute and New York courts' interpretation of it allow for convictions based on conduct that poses only a minimal risk of nonserious harm to a child. We reject this argument as well: NYPL § 260.10(1)'s text and New York court decisions applying the statute require proof of a knowing mental state and a likelihood of harm, and Matthews has not shown a realistic probability of conviction for conduct that does not pose a likelihood of harm.

We DENY the petition for review.

## BACKGROUND

Petitioner Gerard Patrick Matthews is a native and citizen of Ireland who has lived in the United States as a lawful permanent resident since 1989. Matthews, who was physically and sexually abused as a child, has a long history of alcoholism and has repeatedly exposed himself in public while intoxicated. Between 1990 and 2011, these public exposure incidents resulted in at least nine convictions for public lewdness and two convictions for endangering the welfare

4

of a child under New York Penal Law ("NYPL") § 260.10(1).[2] Section § 260.10(1) prohibits, as relevant here, "knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." Matthews was convicted in 2002 of violating NYPL § 260.10(1) and was sentenced to six months' imprisonment. In 2003, he pleaded guilty to another NYPL § 260.10(1) violation as well as a public lewdness charge under NYPL § 245.00 and was sentenced to concurrent terms of imprisonment of one year and 90 days, respectively. Matthews testified at his removal hearing that he never intentionally targeted children when he engaged in publicly lewd behavior; rather, he targeted adults, and the child endangerment charges were tacked onto his public lewdness charges because children happened to be present. However, the IJ did not credit Matthews's accounts of the circumstances of these convictions because they were in stark contrast to the criminal complaints, which alleged that he targeted a nine-year-old boy in one case and two teenage girls in the other.

In 2011, the Department of Homeland Security placed Matthews in removal proceedings through service of a Notice to Appear ("NTA"). The NTA charged Matthews as removable on the ground that his New York convictions for

---

[2] Matthews also has a 1995 conviction for third-degree assault under NYPL § 120.00, for which he was sentenced to three years' probation. This conviction was not charged as a basis for removal.

endangering the welfare of a child were crimes of child abuse, child neglect, or child abandonment under 8 U.S.C. § 1227(a)(2)(E)(i). An IJ initially granted Matthews discretionary relief from removal, but the BIA overturned that ruling in 2013. Matthews petitioned for review, and we remanded the case for the agency to explain fully its denial of relief. *Matthews v. Holder*, 590 F. App'x 75 (2d Cir. 2015). We declined to consider Matthews's then-unexhausted argument that his convictions for endangering the welfare of a child were not removable offenses (i.e., crimes of child abuse, child neglect, or child abandonment), but observed that Matthews could renew this challenge before the agency on remand. *Id*. at 77.

On remand, the Government added an additional charge that Matthews was removable for having been convicted of two crimes involving moral turpitude ("CIMTs") based on the public lewdness convictions in 1990 and 1994. *See* INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii) ("Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct . . . is deportable.").

In April 2016, the IJ denied all relief and ordered Matthews removed. No. A042 231 142 (Immig. Ct. N.Y. City Apr. 7, 2016). The IJ found that Matthews's public lewdness convictions were not CIMTs, but concluded that Matthews was

6

removable for crimes of child abuse, neglect, or abandonment based on his convictions under NYPL § 260.10(1). The IJ relied on the BIA's precedential decision in *Matter of Mendoza Osorio*, 26 I. & N. Dec. 703 (B.I.A. 2016), which held that a conviction for endangering the welfare of a child under NYPL § 260.10(1) is a crime of child abuse, neglect, or abandonment under the INA. The IJ denied both adjustment of status and cancellation of removal as a matter of discretion, reasoning that Matthews's "several positive factors" (over twenty-five years' residence in the United States, a strong relationship with his U.S.-citizen wife, work history, and payment of taxes) were outweighed by his criminal history and lack of rehabilitation.

In August 2016, the BIA dismissed Matthews's appeal. *In re Gerard Patrick Matthews*, No. A042 231 142 (B.I.A. Aug. 30, 2016). The BIA agreed that Matthews was removable, rejecting his argument that *Mendoza Osorio* misinterpreted the scope of New York's law and holding that NYPL § 260.10(1) "requires a knowing act with a likelihood of harm to a child." Certified Administrative Record ("CAR") at 4. The BIA also agreed with the IJ that Matthews did not merit discretionary relief. *Id.* at 5.

7

Matthews, who is represented by pro bono counsel, timely petitioned for review.

## DISCUSSION

### I. Standard of Review

Where, as here, "the BIA has adopted the IJ's reasoning and offered additional commentary, we review the decision of the IJ as supplemented by the BIA." *Gertsenshteyn v. U.S. Dep't of Justice*, 544 F.3d 137, 142 (2d Cir. 2008). "Whether a conviction qualifies as a removable offense under a stated provision of the INA is a question of law." *Mizrahi v. Gonzales*, 492 F.3d 156, 157–58 (2d Cir. 2007). We review the BIA's construction of state criminal law *de novo. Id.* at 158. "To the extent the question requires us to construe a provision of the INA, however, because the administration of that statute is entrusted to the BIA, our review follows the two-step process outlined in *Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)." *Id.*

### II. The BIA's Definition of "Crime of Child Abuse"

Matthews was ordered removed under 8 U.S.C. § 1227(a)(2)(E)(i), which provides that, "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse, child neglect, or child abandonment is deportable." The

8

statute does not define crime of child abuse, neglect, or abandonment, but the BIA

has "interpret[ed] the term 'crime of child abuse' broadly to mean any offense

involving an intentional, knowing, reckless, or criminally negligent act or

omission that constitutes maltreatment of a child or that impairs a child's physical

or mental well-being." *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503, 512 (B.I.A.

2008). The BIA held that,

> At a minimum, this definition encompasses convictions for offenses involving the infliction on a child of physical harm, even if slight; mental or emotional harm, including acts injurious to morals; sexual abuse, including direct acts of sexual contact, but also including acts that induce (or omissions that permit) a child to engage in prostitution, pornography, or other sexually explicit conduct; as well as any act that involves the use or exploitation of a child as an object of sexual gratification or as a tool in the commission of serious crimes, such as drug trafficking.

*Id.* The BIA's definition also covers child endangerment offenses where no actual

harm or injury occurs, so long as the state statute requires a sufficient risk of harm

to a child. *Matter of Soram*, 25 I. & N. Dec. 378, 381–83 (B.I.A. 2010). In *Soram*, the

BIA held that a Colorado child endangerment statute that state courts had

interpreted to require a "reasonable probability" of injury to a child was

categorically a crime of child abuse, neglect, or abandonment. *Id.* at 385–86. The

BIA noted that, given the wide degree of variation in state child endangerment

statutes, "a State-by-State analysis is appropriate to determine whether the risk of

9

harm required by the endangerment-type language in any given State statute is sufficient to bring an offense within the definition of 'child abuse' under the [INA]." *Id.* at 383.

Importantly, this is not the first time we have reviewed the BIA's conclusion that a state child endangerment offense is a removable crime of child abuse, neglect, or abandonment under 8 U.S.C. § 1227(a)(2)(E)(i). In 2015, employing the two-step *Chevron* framework,[3] we found the phrase "crime of child abuse, child neglect, or child abandonment" to be ambiguous because it is not defined in the INA, and we deferred to the BIA's conclusion in *Soram* that this phrase encompassed at least some child endangerment offenses. *Florez*, 779 F.3d at 211—14. We noted that in 1996, when Congress added the crime of child abuse provision to the INA, at least nine states had criminal child abuse statutes that covered endangerment without injury. *Id.* at 212. We suggested, however, that a definition that is not limited to crimes that pose a high enough risk of harm or injury to a child may not be reasonable:

> Although the BIA's definition of 'a crime of child abuse' is expansive,
> it is not unlimited. *Soram* confirms that a state child-endangerment

---

[3] Under *Chevron*, courts ask, first, whether a statute is ambiguous. If it is not ambiguous, courts must apply the statute's clear meaning. Second, if the statute is ambiguous, courts defer to a permissible interpretation of the statute by the administrative agency responsible for its enforcement. 467 U.S. at 842–43.

statute qualifies as a 'crime of child abuse' under the INA only if it requires, as an element of the crime, a sufficiently high *risk* of harm to a child . . . this limitation ensures that the BIA's treatment of state child-endangerment statutes remains within the realm of reason.

*Id.* The BIA has agreed with this position. In *Mendoza Osorio*, the agency "recognize[d] that there are child endangerment statutes that do not require a sufficiently high risk of harm to a child to meet the definition of child abuse, neglect, or abandonment under the [INA]." 26 I. & N. Dec. at 711. As an example, the BIA pointed out that a conviction for misdemeanor child endangerment in California is not a crime of child abuse under the INA because that statute "punishes 'conduct that creates only the bare potential for nonserious harm to a child.'" *Id.* (quoting *Fregozo v. Holder*, 576 F.3d 1030, 1037–38 (9th Cir. 2009)); *see also* Cal. Penal Code § 273a(b) ("Any person who, under circumstances or conditions *other than* those likely to produce great bodily harm or death, . . . willfully causes or permits that child to be placed in a situation where his or her person or health *may* be endangered, is guilty of a misdemeanor." (emphases added)).

Whether a New York misdemeanor conviction for endangering the welfare of a child is a crime of child abuse remains an open question of law in this Circuit. Florez had conceded that NYPL § 260.10(1) fell within the BIA's definition, and

therefore we did not need to decide the issue in that case. *Florez*, 779 F.3d at 209–10, 212.[4] In Matthews's case, the BIA followed *Mendoza Osorio*, a precedential decision holding that NYPL § 260.10(1) is a crime of child abuse. 26 I. & N. Dec. at 705–12. Focusing on the prong of the statute at issue here, "taking action that is likely to be harmful to a child's welfare," the BIA concluded that a conviction under the statute "requires a showing that the defendant knew that his actions were likely to result in physical, mental, or moral harm to a child." *Id.* at 705–06. "To act 'knowingly' under New York law, the defendant must have been 'aware' of the nature of his conduct and of the fact that his actions had the potential for harm." *Id.* at 706 (quoting *People v. Johnson*, 95 N.Y.2d 368, 372 (2000)). "There must also be proof that the harm was 'likely to occur, and not merely possible.'" *Id.* (quoting *People v. Hitchcock*, 98 N.Y.2d 586, 591 (2002)). The BIA reasoned that § 260.10(1) was categorically a crime of child abuse, neglect, or abandonment because a conviction required "a knowing mental state coupled with an act or acts creating a likelihood of harm to a child." *Id.* The BIA addressed several New York cases applying § 260.10(1) and noted that: (1) state courts regularly dismissed

---

[4] In an unpublished decision that pre-dated *Soram*, we expressed skepticism about whether NYPL § 260.10(1) was a crime of child abuse, but we remanded for the BIA to define a "crime of child abuse" in the first instance. *Guzman v. Holder*, 340 F. App'x 679 (2d Cir. 2009) (summary order).

12

endangerment charges or overturned convictions after determining that a defendant's conduct posed less than a likelihood of harm; and (2) the cases in which the New York courts upheld endangerment charges as facially sufficient, or upheld a § 260.10(1) conviction, involved factual circumstances that posed a likelihood of physical, mental, or moral harm and thus fell within the BIA's definition. *Id.* at 707–12. The BIA declined to consider redacted complaints and charging documents in its interpretation of the scope of the New York law on the ground that these documents were not accompanied by any proof that the charges led to a conviction. *Id.* at 707 n.4.

### III. Matthews's Arguments on Appeal

Matthews has two arguments. First, he challenges our decision in *Florez* and argues that we must revisit the *Chevron* issue in light of a recent Supreme Court decision, *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017), which declined to afford *Chevron* deference to the BIA's interpretation of another INA provision involving "sexual abuse of a minor." Second, he argues that NYPL § 260.10(1) does not fit within the broad definition of a crime of child abuse, neglect, or abandonment that we accepted in *Florez* because New York court decisions and charging documents show that a conviction for endangering the welfare of a child

13

under NYPL § 260.10(1) requires only a slight chance of nonserious harm to a child. We address these arguments in turn and conclude that both lack merit.

## A. Revisiting *Florez*

"In our Circuit, panels are 'bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.'" *United States v. Gill*, 748 F.3d 491, 502 n.8 (2d Cir. 2014) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)). However, a panel may overrule a prior decision if "there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004) (quoting *Union of Needletrades, Indus. & Textile Emps. v. INS*, 336 F.3d 200, 210 (2d Cir. 2003)). Matthews argues that the Supreme Court's 2017 decision in *Esquivel-Quintana* casts doubt on *Florez*'s method of statutory interpretation (the traditional two-step *Chevron* analysis) and its conclusion that *Soram*'s definition of a crime of child abuse was a permissible construction of 8 U.S.C. § 1227(a)(2)(E)(i).

In *Esquivel-Quintana* the Supreme Court interpreted 8 U.S.C. § 1101(a)(43)(A), which covers the aggravated felony offense of "sexual abuse of a minor." *Esquivel-Quintana*, 137 S. Ct. at 1567. The issue in that case was whether

14

state statutory rape laws that defined a "minor" as a person under the age of eighteen fell within the INA's definition of sexual abuse of a minor.  *Id.* at 1568.[5] The Supreme Court held that they did not because the federal generic age of consent in 1996 (when this INA provision was enacted) was sixteen.  *Id.* at 1569–72.  The Supreme Court looked to several different sources in reaching this conclusion.  First, the structure of the INA—specifically, the fact that the sexual abuse of a minor offense was designated an "aggravated felony" and placed "in the same subparagraph as murder and rape"—"suggest[ed] that sexual abuse of a minor encompasses only especially egregious felonies."  *Id.* at 1570 (internal quotation marks and citations omitted).  Second, another provision of federal law, 18 U.S.C. § 2243, that criminalized "sexual abuse of a minor or ward," was limited to victims under age sixteen.  *Id.* at 1570–71.  The Court found it especially instructive that Congress enacted 18 U.S.C. § 2243 "in the same omnibus law that added sexual abuse of a minor to the INA."  *Id.* (citing Omnibus Consolidated Appropriations Act, 1997, §§ 121(7), 321, 110 Stat. 3009–31, 3009–627).  Third, the

---

[5] Esquivel-Quintana had pleaded no contest to a California statute criminalizing "unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator" and defining a "minor" as "a person under the age of 18 years."  137 S. Ct. at 1567 (quoting Cal. Penal Code § 261.5(c)).  Thus, the minimum conduct criminalized under this statute would have been consensual sexual intercourse between a seventeen-year-old and a twenty-one-year-old.  *Id.*

Court "look[ed] to state criminal codes for additional evidence about the generic meaning of sexual abuse of a minor," and found that "[a] significant majority of jurisdictions thus set the age of consent at 16 for statutory rape offenses predicated exclusively on the age of the participants." *Id.* at 1571. The Court only briefly addressed *Chevron* deference at the end of its decision. *Id.* at 1572. The Government urged that any ambiguity in the statute should be resolved in its favor under *Chevron*, while Esquivel-Quintana had argued that any ambiguity should be construed in his favor under the rule of lenity. *Id.* The Court stated that there was "no need to resolve whether the rule of lenity or *Chevron* receives priority in this case because the statute, read in context, unambiguously forecloses the Board's interpretation. Therefore, neither the rule of lenity nor *Chevron* applies." *Id.*

In *Esquivel-Quintana*, the Supreme Court did not reject *Chevron* outright or mandate any particular approach to statutory interpretation. At most, the Supreme Court's decision reminds courts to use all available tools of statutory construction in order to discern Congress's intent before concluding that a statutory term is ambiguous and deferring to the implementing agency's interpretation. *Cf. Chevron*, 467 U.S. at 842 ("If the intent of Congress is clear, that

16

is the end of the matter."); *Mizrahi*, 492 F.3d at 158 ("If the statutory language is ambiguous, . . . we resort first to canons of statutory construction, and, if the statutory meaning remains ambiguous, to legislative history, to see if these interpretive clues clearly reveal Congress's intent." (internal quotation marks, citations, and brackets omitted)).[6]   Because the Supreme Court's holding in *Esquivel-Quintana* was narrow and its decision did not relate to the INA's crime of child abuse provision or mandate any particular approach to statutory interpretation, it does not cast doubt on *Florez*.[7]   *Cf. Correa-Diaz v. Sessions*, 881 F.3d 523, 528 (7th Cir.), *cert. denied*, 139 S. Ct. 224 (2018) ("[W]e do not believe *Esquivel-Quintana*'s limited holding overruled all of this Court's previous decisions

---

[6] A June 2018 Supreme Court decision analyzing a different INA provision also concluded that "the Court need not resort to *Chevron* deference" if "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018). Justice Kennedy's concurrence expressed concern that the decisions by the Courts of Appeals on that issue were too quick to defer to the BIA under *Chevron*, and were engaging in a "cursory analysis" rather than using ordinary tools of statutory construction to discern Congress's intent. 138 S. Ct. at 2120 (Kennedy, J., concurring). Justice Kennedy suggested that the Supreme Court "reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that decision." *Id.* at 2121. However, in the absence of such reconsideration, we remain bound by *Chevron.*

[7] Matthews overemphasizes *Esquivel-Quintana*'s survey of state criminal statutes, which was only one of several sources the Supreme Court looked to in that case. *See* 137 S. Ct. at 1571 n.3 (agreeing with the Government that "this sort of multijurisdictional analysis" is not required and stating that "[i]n this case, state criminal codes aid our interpretation of 'sexual abuse of a minor' by offering useful context."). Because the INA's crime of child abuse provision is *not* an aggravated felony (a designation that carries serious consequences such as barring most forms of relief from removal), and there is no other provision of federal law that defines a crime of child abuse, a significant part of *Esquivel-Quintana*'s statutory analysis is inapplicable to this case.

17

deferring to [the] BIA's interpretation of 'sexual abuse of a minor.'"). We conclude that *Florez* remains binding, and for this reason, we continue to defer to the BIA's definition of crime of child abuse, neglect, or abandonment as including child endangerment offenses that pose a sufficiently high level of risk of harm to a child. The next question is whether New York's child endangerment law fits within that definition.

### B. The Categorical Approach

As noted above, the BIA and federal courts agree that state child endangerment statutes must require something more than a mere possibility of nonserious harm to qualify as a crime of child abuse, neglect, or abandonment under the INA. *See Florez*, 779 F.3d at 212 (noting that the BIA's definition "is not unlimited" and "requires, as an element of the crime, a sufficiently high *risk* of harm to a child"); *Fregozo*, 576 F.3d at 1037–38 (holding that California's misdemeanor child endangerment statute was not a crime of child abuse under the INA because it did not require "any particular likelihood of harm to a child"); *Mendoza Osorio*, 26 I. & N. Dec. at 711 (discussing California statute and agreeing that it is not categorically a crime of child abuse). The next issue, then, is whether New York's child endangerment law requires a level of risk of harm to a child that

18

is significant enough to qualify as a crime of child abuse, neglect, or abandonment under the INA.[8]

In determining whether NYPL § 260.10(1) is a crime of child abuse, we employ the "categorical approach," looking only to the text of NYPL § 260.10(1) and New York's interpretation of that statute to determine whether there is a categorical match with the BIA's definition. *Florez*, 779 F.3d at 209–10. We use the categorical approach whenever the relevant INA provision "makes aliens removable based on the nature of their convictions, not based on their actual conduct." *Esquivel-Quintana*, 137 S. Ct. at 1567–68. The child abuse provision, 8 U.S.C. § 1227(a)(2)(E)(i), like several other provisions of the INA, "premises removability not on what an alien has done, or may have done, or is likely to do in the future (tempting as it may be to consider those factors), but on what he or she has been formally *convicted* of in a court of law." *Gertsenshteyn*, 544 F.3d at 145; *see also Velazquez-Herrera*, 24 I. & N. Dec. at 513 (discussing BIA's application of the categorical approach to § 1227(a)(2)(E)(i)).

---

[8] We review the BIA's interpretation of NYPL § 260.10(1) *de novo*, without according *Chevron* deference, because state criminal law falls outside the BIA's area of expertise. *See Gill v. INS*, 420 F.3d 82, 89 (2d Cir. 2005).

Under this categorical approach, "[a]n alien's actual conduct is irrelevant to the inquiry, as the adjudicator must 'presume that the conviction rested upon nothing more than the least of the acts criminalized' under the state statute." *Mellouli v. Lynch*, 135 S. Ct. 1980, 1986 (2015) (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013)). We must identify the least culpable conduct that is punishable under NYPL § 260.10(1) and determine whether that conduct falls within the BIA's definition of a crime of child abuse, neglect, or abandonment. However, the Supreme Court has cautioned that the categorical approach's "focus on the minimum conduct criminalized by the state statute is not an invitation to apply 'legal imagination' to the state offense; there must be a 'realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the [federal] definition of a crime.'" *Moncrieffe*, 569 U.S. at 191 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)); *see also United States v. Hill*, 890 F.3d 51, 59 (2d Cir. 2018).

The Supreme Court first announced the realistic probability standard in 2007 in *Duenas-Alvarez*, 549 U.S. 183. Duenas-Alvarez argued that his state statute of conviction criminalized acts outside the generic definition and thus was not categorically a removable theft offense. *Id.* at 190–94. In rejecting this argument,

the Court shifted the burden of proof from the Government to Duenas-Alvarez to demonstrate that, despite the apparent categorical match between the state statute and the generic federal definition of theft, there was a realistic probability that the state would apply the state statute to conduct outside the generic definition. *Id.* at 193.

In *Moncrieffe*, the Supreme Court again referenced the "realistic probability" component of the categorical approach. 569 U.S. at 206. The Court held that a Georgia statute criminalizing possession with intent to distribute marijuana was not categorically an aggravated felony drug trafficking offense because it criminalized conduct that was punishable as a misdemeanor as well as a felony under federal law. More specifically, the Georgia statute made it a crime, *inter alia*, to possess with intent to distribute small amounts of marijuana, while federal law required a sale for the crime to qualify as a felony. *Id.* at 193–95. The Government argued that the Court's holding would "frustrate the enforcement of other aggravated felony provisions, like § 1101(a)(43)(C), which refers to a federal firearms statute that contains an exception for 'antique firearms.'" *Id.* at 205. The Court rejected the Government's argument, stating that, given that "*Duenas-Alvarez* requires that there be 'a realistic probability . . . that the State would apply

its statute to conduct that falls outside the generic definition of a crime[,]' [t]o defeat the categorical comparison in this manner, a noncitizen would have to demonstrate that the State actually prosecutes the relevant offense in cases involving antique firearms." *Id.* at 205–06 (internal citation omitted).

Other than in *Duenas-Alvarez* and *Moncrieffe*, the Supreme Court has not expanded or again discussed the "realistic probability" approach in the context of determining removability. Importantly, the Supreme Court has not yet "specif[ied] what type of evidence may be used to satisfy the 'realistic probability' requirement." *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 1005 (9th Cir. 2008), *overruled on other grounds by Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009); *see also Jean-Louis v. Att'y Gen.*, 582 F.3d 462, 481–82 (3d Cir. 2009). Although it is the Government's burden to prove removability by clear and convincing evidence, 8 U.S.C. § 1229a(c)(3)(A); *Woodby v. INS*, 385 U.S. 276, 277, 286 (1966), *Moncrieffe* and *Duenas-Alvarez* suggest that it is a noncitizen's burden to establish a realistic probability of being convicted for conduct outside the federal definition, at least in cases where the state and federal statutes appear to be a categorical match. *See also Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018) (concluding that the BIA erred in applying "realistic probability" test where statutes were not a

categorical match, but explaining that where there is a match, the noncitizen can "show a 'realistic probability' that 'the State would apply its statute to conduct that falls outside the generic definition of a crime.'" (quoting *Duenas-Alvarez*, 549 U.S. at 193)). Because we conclude, as set forth below, that the state and federal statutes are a categorical match, Matthews has the burden to show that New York applies NYPL § 260.10(1) to conduct that falls outside the BIA's definition of a crime of child abuse.

### C. The BIA's Definition of a Crime of Child Abuse is a Categorial Match with NYPL § 260.10(1)

Section 260.10(1) criminalizes, as relevant here, "knowingly act[ing] in a manner likely to be injurious to the physical, mental, or moral welfare of a child less than seventeen years old." New York defines the requisite *mens rea*, "knowingly," as follows: "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists." NYPL § 15.05(2). "Likely" is defined as "probable," "showing a strong tendency," or "reasonably expected." Black's Law Dictionary (10th ed. 2014). The New York Court of Appeals has interpreted NYPL § 260.10(1) as requiring both that the defendant acted "with an *awareness* of the potential for harm" and "that the harm was likely

to occur, and not merely possible.*" People v. Hitchcock*, 98 N.Y.2d 586, 590–91 (2002) (emphasis added); *see also People v. Johnson*, 95 N.Y.2d 368, 372 (2000) ("The Legislature specifically recognized that behavior that was *likely* to produce harm to a child's physical, mental or moral well-being fell within its sweep as long as the defendant was *aware* of its potential for harm to a child."); *People v. Simmons*, 92 N.Y.2d 829, 830 (1998) ("Actual harm to the child need not result for liability under the statute to attach, it being sufficient that the defendant act in a manner which is likely to result in harm to the child, knowing of the likelihood of such harm coming to the child.").

The case law illustrates that although the question of whether a defendant's conduct is likely to harm a child is highly "fact specific," evidence of likely harm is required to convict a defendant under NYPL § 260.10(1). *Johnson*, 95 N.Y.2d at 373. In *Johnson*, the Court of Appeals cited "social science and psychological studies," noting "the profound adverse effect on children who witness domestic violence." *Id.* at 372 n.*.

In *People v. Simmons*, the defendant was charged with "repeatedly directing vulgar remarks of a sexual nature" to a child roughly two years old. 92 N.Y.2d at 830. The New York Court of Appeals recognized that the "child was in the

24

formative stages of speech and learning, had some verbal cognitive abilities and in fact reacted to defendant's vulgar queries, by answering 'yes.'" *Id.* Under these circumstances, "[t]he jury therefore may reasonably have concluded that the totality of defendant's remarks, repeated to the child over a six-week period at a crucial stage in her intellectual and social development, would have combined to create a *likelihood of harm*, regardless of the child's current level of understanding." *Id.* at 831 (emphasis added). The court recognized that jurors could "draw[] upon their common human experience and commonsense understanding of the nature of children" to conclude that the defendant's "remarks were *likely* to have caused the child harm." *Id.* (emphasis added). Our own jurisprudence similarly allows jurors to rely on common sense and experience to draw inferences such as whether a defendant acted with criminal intent. *See United States v. Anderson*, 747 F.3d 51, 70 (2d Cir. 2014) ("[A]lthough the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door: 'Jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.'" (quoting *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008)).

New York appellate courts have reversed NYPL § 260.10(1) convictions after finding insufficient evidence or improper instructions regarding either a defendant's knowledge or an actual likelihood of physical, mental, or moral harm to a child.  *See People v. Hosue*, 56 N.Y.S.3d 764, 767–68 (2d Dep't 2017) (weight of evidence was against guilty verdict for attempted child endangerment where defendant pushed his seven-year-old daughter's mother during an altercation but "[t]here was no evidence of a history of domestic violence between the parties"); *People v. Coveney*, 21 N.Y.S.3d 523, 528–29 (2d Dep't 2015) (vacating child endangerment conviction because there was no evidence of any nexus between defendants' conduct and a likelihood of harm to the complainant's children); *People v. Chase*, 720 N.Y.S.2d 707, 709 (2d Dep't 2000) (requiring a "true likelihood of injury which is not 'speculative'" and finding that the specific circumstances of defendant's driving while intoxicated did not establish either a likelihood of harm or defendant's knowledge beyond a reasonable doubt); *People v. Simmons*, 635 N.Y.S.2d 373, 374 (4th Dep't 1995) ("Because the degree of culpability required by the statute is actual knowledge, it was reversible error to charge the jury that it could find defendant guilty based upon what he should have known.").

26

As the BIA discussed in *Mendoza Osorio*, 26 I. & N. Dec. at 707 n.3, New York criminal courts have also dismissed child endangerment charges as legally insufficient in cases where the prosecution failed to allege a sufficient, non-speculative risk of injury to a child. *See People v. Ventura*, 801 N.Y.S.2d 241, 2005 WL 735873, at *2 (Crim. Ct. 2005) (dismissing complaint as facially insufficient because defendant's act of taking another's cell phone and throwing it against a wall did not "pose[] a likelihood of either physical or mental harm to the eleven and fourteen year-olds present"); *People v. Grajales*, 686 N.Y.S.2d 608, 610 (Crim. Ct. 1999) (dismissing child endangerment counts for marijuana possession because "the potential harm to the child cannot be merely remote or speculative in nature").

This is *not* a situation, therefore, in which the state statute, on its face, stretches further than the BIA's definition; instead, the state statute and the BIA's definition appear to be a categorical match.[9] *Compare Mendoza Osorio*, 26 I. & N. Dec. at 706 ("These elements—a knowing mental state coupled with an act or acts creating a likelihood of harm to a child—fit within our definition of a 'crime of

---

[9] To the extent that Matthews takes issue with New York's inclusion of "moral harm" against children, we note that the BIA's definition also encompasses "convictions for offenses involving . . . mental or emotional harm, including acts injurious to morals." *Velazquez-Herrera*, 24 I. & N. Dec. at 512.

child abuse, child neglect, or child abandonment.'"), *with Mathis v. United States*, 136 S. Ct. 2243, 2251 (2016) ("[T]he elements of Mathis's crime of conviction . . . cover a greater swath of conduct than the elements of the relevant [federal] offense . . . . Under our precedents, that undisputed disparity resolves this case."), *and Hylton*, 897 F.3d at 63 ("[T]he statutory language itself . . . creates the realistic probability that a state would apply the statute to conduct beyond the generic definition." (quoting *Ramos v. U.S. Att'y Gen.*, 709 F.3d 1066, 1072 (11th Cir. 2013)).

### D. Matthews Has Not Demonstrated a Realistic Probability that the Statute is Applied More Broadly than the BIA's Definition

Where a statute is not facially overbroad, the realistic probability approach requires a noncitizen to demonstrate "that the State actually prosecutes the relevant offense in cases" that fall outside the federal definition. *Moncrieffe*, 569 U.S. at 206. Matthews must "at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *Duenas-Alvarez*, 549 U.S. at 193.

Matthews does not argue that the facts underlying his convictions do not match the BIA's definition of a crime of child abuse. Rather, he argues that New York courts have imposed liability for child endangerment in situations that may be illustrative of "bad parenting" or other "minor missteps," but do not actually

28

pose a likelihood of physical, mental, or moral harm to a child.  Petitioner's Br. at 50.  He points to two categories of cases: "home alone" cases and cases involving the commission of criminal activity, such as controlled substance use or possession, in the presence of children.

For the "home alone" cases, Matthews and the dissent cite *People v. Reyes*, in which a New York criminal court denied a defendant's motion to dismiss a child endangerment charge as facially insufficient.  872 N.Y.S.2d 692, 2008 WL 3010044 (Crim. Ct. Aug. 6, 2008); *see* N.Y. Crim Proc. Law § 100.40(4)(b) (providing that a misdemeanor complaint is sufficient on its face when its factual allegations "provide reasonable cause to believe that the defendant committed the offense charged.").  In *Reyes*, the complaint alleged that a mother left her four-year-old child home alone for about fifteen minutes in order to get groceries; although the mother stated that the child was asleep when she left and she remained within earshot, the police officer who found the child stated that the child was awake and opened the door for the officers, who were strangers to the child.  2008 WL 3010044, at *1–2.  The court determined that the allegations in the complaint made out a sufficient likelihood of harm, citing to a case where a four-year-old started a fire when left home alone for about ten minutes, and concluded that factual issues

29

such as whether the child was asleep and whether the defendant remained within earshot were better left for trial. *Id.* at \*3 & n.1. The court stated:

> We hold that the issue of whether there is some minimum time that a child must be left alone in order to hold a defendant liable under PL § 260.10(1) is ill-suited for resolution on a motion to dismiss for facial insufficiency. Among the factors which would appear appropriate for consideration are the age of the child, the length of time involved, the maturity of the particular child, and the reason why the child was left alone.

*Id.* at \*1. If the case proceeded to trial, the prosecution would have been put to its burden to convince a jury that the defendant's conduct resulted in a likelihood of harm to her child and that the defendant knew that her conduct was likely to result in injury to her child. *Reyes* and other "home alone" cases illustrate that New York courts are cognizant of the line between "bad parenting" and child endangerment, and provide prosecutors and juries with guideposts for determining when the factual circumstances of a case establish culpability under NYPL § 260.10(1).[10]

---

[10] Similarly, although New York criminal courts are somewhat divided on whether the possession and use of marijuana and other controlled substances pose a sufficient risk of harm to qualify as child endangerment, the cases distinguish between situations in which children are actually exposed to controlled substances, and those in which the defendant made an effort to hide or conceal the illicit substances. *Compare Grajales*, 686 N.Y.S.2d at 609–10 (dismissing endangerment charges on the basis that "the mere presence of mari[j]uana alone" in an apartment with children present is not enough to show a likelihood of harm), *with People v. Kennedy*, 904 N.Y.S.2d 577, 579 3rd Dep't 2010) (affirming child endangerment conviction based on teenage daughters' repeated exposure to cocaine residue and paraphernalia in defendant's home). Matthews, moreover, has not identified any case involving an actual child endangerment conviction that was based upon an overbroad application of the statute to conduct involving the use or possession of a controlled

The dissent, by contrast, highlights *Reyes* and other decisions in which New York trial courts upheld the sufficiency of criminal misdemeanor complaints brought under Section 260.10(1) for the proposition that the state courts are applying the statute inconsistently and, accordingly, more broadly than the federal definition. While we appreciate the dissent's concern that some statements by trial courts may not correctly interpret the state statute, there is no question that the statute, as interpreted by the New York Court of Appeals, is a categorical match with the BIA's definition, and there is no New York appellate decision cited by the dissent that has upheld a conviction that sweeps more broadly than the BIA definition. The dissent notes correctly that the Supreme Court has yet to articulate the contours of the "realistic probability" test to argue that our analysis is not so limited, but it is for this precise reason that we find ourselves constrained from reading these cases as contravening the interpretation espoused by New York's highest court.[11]

---

substance. The only controlled substance case he relies on involved a trial court's denial of a motion to dismiss. *See People v. Alvarez*, 860 N.Y.S.2d 745 (Crim. Ct. 2008). In *Alvarez*, the court relied on the "strong odor of mari[j]uana throughout the apartment," which implied that the defendant had been smoking marijuana while the children were present, as an aggravating factor that distinguished the case from others involving the mere possession of marijuana. *Id.* at 747–49.

[11] In Armed Career Criminal Act ("ACCA") cases, moreover, which also employ the categorical approach and realistic probability test, the Supreme Court and other Courts of Appeals have

For similar reasons, we decline to rely upon charging documents to alter our analysis. Amici have submitted several redacted arrest reports, complaints, and misdemeanor informations that charge defendants with violating NYPL § 260.10(1) for conduct such as: driving with a suspended license with a child in the car, shoplifting while caring for an infant or toddler, leaving a nine-year-old and sleeping five-year-old in a car for ten minutes with the windows open, yelling and knocking items from a shelf in the presence of two children, and smoking marijuana in a public playground while children are playing. Matthews, amici, and the dissent argue that these charging documents show a realistic probability that New York prosecutes conduct that only poses a minimal risk of harm to children.

The Government does not contest the authenticity of these documents, although in Matthews's case the IJ and BIA relied on *Mendoza Osorio*, a

---

recognized that federal courts are bound by the highest state court's interpretations of state law. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) (holding that although the meaning of ACCA's requirement of "physical force" is a question of federal law, the Court was "bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements of" the Florida battery statute at issue); *United States v. Holloway*, 630 F.3d 252, 259–60 (1st Cir. 2011) (citing *Johnson* for the same proposition); *see also United States v. Southers*, 866 F.3d 364, 368 (6th Cir. 2017) (rejecting notion that defendant's reliance on Tennessee intermediate appellate court decisions could satisfy "realistic probability" test to the extent that those "decisions appl[ied] the Tennessee robbery statute in a manner . . . inconsistent with Tennessee Supreme Court precedent.").

precedential case in which the BIA refused to consider charging documents without proof of a subsequent conviction, reasoning that "a judge or jury may have found that the facts as charged were insufficient to support a conviction." 26 I. & N. Dec. at 707 n.4. The fact that Matthews did not submit these documents to the IJ or BIA prevents us from reviewing them because in the immigration context, we are strictly constrained to the administrative record. 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based.").[12]

Even if we could consider these charging documents, we are not convinced that they would change the outcome of this case. On the one hand, we recognize the concern expressed by Matthews, amici, and the dissent that prosecutors may be overcharging conduct under the child endangerment statute, and that the vast majority of child endangerment charges result in guilty pleas and minimal sentences. The dissent argues that we can consider these charging documents, in

---

[12] We have taken judicial notice of material and undisputed changes in country conditions that occur between the BIA's decision and our review, *see Hoxhallari v. Gonzales*, 468 F.3d 179, 185 n.5 (2d Cir. 2006) (*per curiam*), but that exception does not apply here. And Matthews and amici have not provided any information about the court proceedings in which these arrest reports and misdemeanor charges were filed, such that we might take judicial notice of those proceedings. *Cf. Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, . . . to establish the fact of such litigation and related filings.").

combination with a high incidence of guilty pleas, to infer that defendants are pleading guilty to charges that are broader than the BIA's definition. Amici, however, have not submitted *any* evidence that these charging documents led to convictions (whether through guilty pleas or trial), or that any court upheld the allegations in these documents as facially sufficient. Without specific evidence linking charging documents to guilty pleas, we have no way of knowing the circumstances of the individual offenses that caused the prosecutors to bring the charges or the defendants to plead to those charges. Moreover, this is not a situation where we are without guidance because, as we have previously explained, New York's highest court has clarified the least-acts-criminalized by NYPL § 260.10(1) and requires a likelihood of harm to a child to support a conviction. For this reason, we agree with the BIA's decision in *Mendoza Osorio* and conclude that the charging documents and the cases Matthews and the dissent point to are not enough to show a realistic probability that NYPL § 260.10(1) covers conduct that falls outside the BIA's definition of a crime of child abuse.[13]

---

[13] The dissent would grant Matthews's petition on the additional and independent ground that the BIA's current definition of "child abuse" cannot be applied retroactively to Matthews's 2002 and 2003 state convictions. Counsel, however, has not raised this issue, and we therefore do not reach it. Nor do we foreclose the possibility that another petitioner might challenge an order of removal premised on convictions that predated the BIA's contemporaneous definition in a proper case.

34

**CONCLUSION**

Because we hold that NYPL § 260.10(1) is a categorical match with the BIA's definition of "crime of child abuse," to which we owe *Chevron* deference, and because Matthews has not established a realistic probability that the statute encompasses conduct that stretches further than the BIA's definition, we **DENY** the petition for review.

---

Similarly, although we appreciate the policy concerns that Matthews, amici, and the dissent have thoughtfully highlighted—such as the risk of separating families or disqualifying domestic violence victims from obtaining immigration relief—these concerns are not present in Matthews's case, and he has not presented evidence that such concerns have materialized in the context of New York's child endangerment law.

CARNEY, *Circuit Judge*, dissenting.

I respectfully dissent.

New York Penal Law ("NYPL") § 260.10(1) provides in relevant part, "A person is guilty of endangering the welfare of a child when: (1) He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old. . . ." The Board of Immigration Appeals ("BIA") has found the far-ranging and vaguely contoured terms of this state misdemeanor child endangerment statute to be categorically equivalent to the similarly ambiguous federal definition of the phrase "crime of child abuse, child neglect, or child abandonment." Under the Immigration and Nationality Act ("INA"), non-citizens convicted of crimes falling under this federal definition are both removable from the United States and absolutely barred from seeking many forms of discretionary relief. 8 U.S.C. § 1227(a)(2)(E)(i); *id.* § 1229b(b)(1)(C).

Our court has previously deferred to and affirmed the agency's legal interpretations of the federal statute. *See Florez v. Holder*, 779 F.3d 207 (2d Cir. 2015). Given the dramatic evolution of the BIA's interpretation of the ambiguous federal law over the past thirty years, from requiring an intentional act involving some "form of cruelty to a child's physical, moral or mental well-being," *In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 996 (BIA 1999), to requiring only an act that creates a "reasonable probability that the child's life or health will be endangered," *Matter of Soram*, 25 I. & N. Dec. 378, 385 (BIA 2010), one might

question the decision to defer. But I agree with the majority that we are bound by that decision.

Even accepting the BIA's interpretation of the INA, however, the agency's decision to equate New York "child endangerment" law categorically with INA "child abuse"—a decision first set forth in *Matter of Mendoza Osorio*, 26 I. & N. Dec. 703 (BIA 2016), and now applied to Matthews's case—does not in my view hold under the analysis prescribed by the Supreme Court in *Moncrieffe v. Holder*, 569 U.S. 184 (2013), and, before that, in *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). Under these binding Supreme Court precedents, we must assess whether, in applying its criminal law to the "least of the acts criminalized" under the state statute, there is a "realistic probability" that a state could successfully prosecute an individual for conduct that falls outside the federal definition. A review of state trial court opinions and publicly available data reveals that individuals are convicted under New York's child endangerment statute for conduct that, even if richly deserving of criticism, nonetheless falls outside the INA's generic definition of a "crime of child abuse" as conceived of by the BIA.

For example, in New York, individuals have been convicted under § 260.10(1) for leaving a sleeping child unattended in an apartment for at least fifteen minutes, *People v. Reyes*, 2008 WL 3010044, 872 N.Y.S.2d 692 (Crim. Ct. 2008), repeatedly directing vulgar remarks at a toddler, *People v. Simmons*, 92 N.Y.2d 829 (1998), and possessing marijuana in their residence in proximity to children, *People v. Alvarez*, 860 N.Y.S.2d 745 (Crim. Ct. 2008). *See Guzman v. Holder*, 340 F. App'x 679, 682 (2d Cir. 2009) (summary order) (observing that "the

2

New York provision is extraordinarily broad"). Contrary to the expectation expressed in *Florez* that a conviction under the state statute will be supported by a "sufficiently high *risk* of harm," 779 F.3d at 212,—a standard that itself floats, unmoored, on the fickle sea of child-rearing conventions—state prosecutions have gone forward and convictions have been secured without evidence of the risk or nature of the harm posed by the ostensibly criminal conduct. *See* Part I, below. Similarly undercutting the BIA's analysis, the lesser boundaries of the state statute as applied to one significant category of prosecutions are unclear even to the state adjudicators: as New York trial courts have repeatedly commented, "[t]here is no clear consensus among New York cases regarding the sufficiency of an accusatory instrument charging Endangering the Welfare of a Child regarding leaving a child alone at home or in a vehicle." *People v. Hot*, 2018 WL 652480, at \*2, 94 N.Y.S.3d 539 (Crim. Ct. 2018).

In my view, these facts, supported by reliable data about how often the state prosecutes the crime and obtains guilty pleas that are punished by non-carceral sentences, take the state crime significantly out of alignment with the INA's definition of child abuse. They demonstrate that, for immigration law purposes, the crimes are not categorically equivalent.

Relying primarily on published New York state appellate decisions, the majority declines to consider the full spectrum of publicly available data and evidence of prosecutions under the statute. But we need not be so restricted: the data and the lower court decisions are largely in the public record, and the texts of those decisions that are nominally "unreported" are nonetheless publicly

3

available. Even if Matthews may not have presented these precise data and court decisions to the BIA, in assessing the "realistic probability" of prosecution under the statute as we apply the categorical approach, our panel may and indeed must consider such public data that reflects the reach of the statute as it is actually applied. These data and decisions paint a picture of prosecutions and guilty pleas showing that the statute's broad and ambiguous language is enforced in a far more expansive, flexible, and subjective fashion than the reported case law might lead one to expect. To overlook this material is to rely on a flawed foundation in concluding that, as prosecuted, New York misdemeanor "child endangerment" is equivalent to the INA's definition of "child abuse."

The results of the equation are troubling: to adopt the BIA's conclusion of categorical equivalence in 2019, and to apply that conclusion retroactively, is to impose consequences on guilty pleas entered years ago that were then unimaginable for a non-citizen defendant. *See generally Obeya v. Sessions*, 884 F.3d 442 (2d Cir. 2018); *Lugo v. Holder*, 783 F.3d 119 (2d Cir. 2015). To be sure, the charged crime of some who were subject to such prosecutions under § 260.10(1) likely fell in the heartland of the generic INA definition of "child abuse." In such cases, that separation from even one's own children may be the consequence of a guilty plea is no surprise; rather, it is envisioned and may be required by both criminal and family law. But the conclusion seems unavoidable that, for those whose charged endangerment of a child posed more attenuated, limited, or uncertain risks—those whose alleged neglect was leaving a sleeping child home alone briefly, for example; perhaps even for Matthews—the calculus of entering a guilty plea would surely have been significantly altered had the accused

4

parents known that doing so could mean risking the loss of the right to live with their own children in the United States. Although the majority's opinion does not hold that the BIA may apply its ruling retroactively in *all* cases, today's decision means that those parents will need to live with fear of that new risk.

Aggravating these circumstances yet further, under the INA, individuals convicted of a crime of "child abuse" are categorically ineligible for the cancellation of removal that is otherwise available to non-permanent residents. 8 U.S.C. § 1229b(b)(1)(C). This discretionary form of relief requires the petitioner to show that removal would effect "exceptional and extremely unusual hardship" to a U.S. citizen- or lawful permanent resident- child (or other qualifying relative). *Id.* § 1229b(b)(1)(D). Today's holding means that some individuals who pleaded guilty to New York misdemeanor endangerment of a child, and who are also able to prove that separation would cause "exceptional and extremely unusual hardship" to that same child, would be unable even to seek discretionary relief. I see no reason to conclude from the INA's language or history that Congress intended that result.

The majority's affirmance of the BIA's erroneous conclusion also opens the door to consequences that are fundamentally at odds with Congress's stated aim in enacting the immigration portions of the Violence Against Women Act ("VAWA"). These authorize immigration courts to provide discretionary relief from removal for individuals who have been "battered or subjected to extreme cruelty" by a U.S. citizen or lawful permanent resident. 8 U.S.C. § 1229b(b)(2)(A)(i). But individuals convicted of a crime falling within the INA

5

definition of "child abuse" are ineligible for cancellation of removal under these "battered spouse or child" provisions. *Id.* § 1229b(b)(2)(A)(iv). This effect, too, suggests the error of the agency's analysis.

The majority thus errs, in my view, by denying Matthews's petition.

## I.

Gerard Matthews became a lawful permanent resident of the United States in 1989, having emigrated to this country from Ireland.[1] A.R. 97. For some period of his residency, he has worked as a carpenter; he has consistently paid his taxes. *Id.* He has been married to a U.S. citizen since 2001. *Id.*

In 2016, the BIA entered a removal order against him based primarily on his convictions in 2002 and 2003 under the New York misdemeanor child endangerment statute, NYPL § 260.10(1).[2] As relevant here, § 260.10(1) proscribes a "knowing[] act[] [done] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." For his part, Matthews's unhappy predicate acts were exposing himself on public streets in the proximity of minors, in 2002 and 2003. Matthews, himself a victim of child abuse during his youth in Ireland and who has been convicted of public

---

[1] These facts are taken from the April 7, 2016 order of the Immigration Judge finding Matthews removable.

[2] A prior removal order was entered against him in 2011 based on convictions that he sustained in the 1990s for public lewdness, a violation of NYPL § 245.00. The order was rescinded after he successfully challenged it. *See Matthews v. Holder*, 590 Fed. App'x 75 (2d Cir. 2015).

lewdness on other occasions not involving minors, has sought and undergone treatment for his underlying disorder. A.R. 98–99.

To prevail on his petition for review, Matthews must prove that § 260.10(1) criminalizes conduct falling outside the INA's definition of a "crime of child abuse, child neglect, or child abandonment"—for present purposes, the operative phrase in the INA. 8 U.S.C. § 1227(a)(2)(E)(i).[3] He may do so by demonstrating a "realistic probability . . . that the State would apply its statute to conduct that falls outside the generic definition," and pointing to "other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). I believe that Matthews has made that showing.

## A. Defining the Generic INA Offense

Determining whether NYPL § 260.10(1) criminalizes conduct beyond the generic INA offense of child abuse requires that we first identify that generic definition.

The BIA has not made the task a simple one: its understanding of the "generic offense" has changed significantly over the past two decades. In the late 1990s, the BIA focused on acts of "cruelty" to children, construing the INA phrase to cover "[a]ny form of cruelty to a child's physical, moral or mental well-being." *In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 996 (1999). In 2008, in *Matter*

---

[3] Section 237(a)(2)(E)(i) of the INA is codified at 8 U.S.C. § 1227(a)(2)(E)(i). For the reader's convenience, I refer to 8 U.S.C. § 1227(a)(2)(E)(i), the codified section, instead of the section number in the enacted bill.

*of Velazquez-Herrera*, 24 I. & N. Dec. 503, 512 (BIA 2008), the agency meaningfully broadened its operative definition in several respects, holding that it covered not only "intentional, knowing, [or] reckless" conduct, but "criminally negligent act[s] or omission[s]" as well.[4] Its 2008 decision appeared to emphasize the sexual mistreatment of children and strongly suggested that some quantum of actual harm or injury to a child was required:

> At a minimum, this definition encompasses convictions for offenses involving the infliction on a child of physical harm, even if slight; mental or emotional harm, including acts injurious to morals; sexual abuse, including direct acts of sexual contact, but also including acts that induce (or omissions that permit) a child to engage in prostitution, pornography, or other sexually explicit conduct; as well as any act that involves the use or exploitation of a child as an object of sexual gratification or as a tool in the commission of serious crimes, such as drug trafficking.

*Id.*

Two years after *Velazquez-Herrera* was decided, in *Matter of Soram*, 25 I. & N. Dec. 378 (BIA 2010), the agency announced that the statutory definition that it

---

[4] The BIA's discussion in *Rodriguez-Rodriguez* was dictum. Nevertheless, the agency cited its "cruelty" formulation in several non-precedential decisions preceding *Velazquez-Herrera*. *See, e.g., In re Pacheco Fregozo*, 2005 WL 698590, at *1 (BIA 2005); *In re Maltez-Salazar*, 2005 WL 952489, at *1 (BIA 2005); *In re Manzano-Hernandez*, 2005 WL 698392 at *2 (BIA 2005).

In turn, several Circuit courts deferred to the formulation stated in *Rodriguez-Rodriguez*, and this Court, in a footnote, suggested that it provided the operative definition. *See Ochieng v. Mukasey*, 520 F.3d 1110, 1114–15 (10th Cir. 2008) (deferring to *Rodriguez-Rodriguez*); *Loeza-Dominguez v. Gonzales*, 428 F.3d 1156, 1158 (8th Cir. 2005) (same); *Nguyen v. Chertoff*, 501 F.3d 107, 114 n.9 (2d Cir. 2007) (noting *Rodriguez-Rodriguez* definition).

will apply is not limited to "those [offenses] requiring proof of *actual* harm or injury to a child," *id.* at 381 (emphasis added), but includes those in which the conduct created "a *reasonable probability* that the child's life or health will be endangered," *id.* at 384. Five years later, in *Florez v. Holder*, we accorded *Chevron* deference to that expansive construction of the INA and held that a state child endangerment statute will be held categorically to match the INA's generic definition if "it requires, as an element of the crime, a sufficiently high *risk* of harm to a child." 779 F.3d 207, 212 (2d Cir. 2015).

In 2016, in *Matter of Mendoza Osorio*, 26 I. & N. Dec. 703 (BIA 2016), the BIA acknowledged that some state child endangerment statutes "do not require a sufficiently high risk of a harm to a child to meet the [INA's generic] definition." *Id.* at 711. As an example, the agency cited a California law criminalizing "conduct that places a child 'in a situation where his or her person or health *may* be endangered,'" which the Ninth Circuit described as "punish[ing] 'conduct that creates only the bare potential for nonserious harm to a child.'" *Id.* (quoting *Fregozo v. Holder*, 576 F.3d 1030, 1038 (9th Cir. 2009)). Since then, the BIA has not spelled out what level of risk, of what type of harm, will satisfy the generic INA definition.

Even before its decisions in *Soram* and *Mendoza Osorio*, we pointed out (albeit in a non-precedential order), that the agency's standards for the level and type of risk required by the INA's generic definition of "child abuse" have been evolving and expanding; its limits remain unclear. *Guzman v. Holder*, 340 F. App'x 679 (2d Cir. 2009) (summary order); *see also Martinez-Cedillo v. Sessions*, 896

9

F.3d 979, 999 (9th Cir. 2018) (Wardlaw, *J.*, dissenting) (outlining history of BIA's changing position and opining that Board's failure "to define the precise level of risk required" divorces its definition from statutory text and renders its definition "judicially unadministrable and overly vague").[5] Although the definitional task admittedly is not an easy one, the BIA neither articulates the quantum of risk required by the generic crime nor addresses the functional relationship between the gravity of the risk posed and likelihood of the risk's realization: a reasonable person might expect that the lower the harm presented by certain conduct, the higher the likelihood need be of its occurrence to create criminal liability. For example, while it is easy to *imagine* all kinds of harms, including mortal harm, that could arise from leaving a sleeping four-year-old child alone in an apartment for fifteen minutes while a parent runs to a neighboring store for milk, the *likely* harm seems minimal: this is a risk that some reasonable and caring parents will run if pressed by circumstances.

What is clear is that the BIA has deemed that the level of risk was adequate in the Colorado statute considered in *Soram* to meet the generic INA child abuse definition—a "*reasonable probability* that the child's *life or health will* be endangered"—but inadequate in the California statute considered in *Fregozo*—a child's "person or health *may be* endangered." Recognizing the haziness of this conception, one of our sister Circuits has recently concluded that a conviction

---

[5] The Ninth Circuit's decision in *Martinez-Cedillo* and Judge Wardlaw's dissent in that case were withdrawn pending en banc review. *Martinez-Cedillo v. Barr*, 918 F.3d 601 (9th Cir. 2019). The appeal was recently dismissed altogether as moot in light of the petitioner's death. *Martinez-Cedillo v. Barr*, No. 14-71742, 2019 WL 2136113 (9th Cir. May 16, 2019). I cite to Judge Wardlaw's observations for their persuasive value alone.

under a Pennsylvania child endangerment statute that "merely requires conduct that *could threaten* a child's *welfare*" does not amount to a crime of child abuse under the INA's generic definition. *Zhi Fei Liao v. Attorney Gen.*, 910 F.3d 714, 722 (3d Cir. 2018) (internal quotation marks omitted) (emphasis added).

With this background, I turn briefly to the text of the relevant New York law. As noted above, NYPL § 260.10(1) provides that a defendant is guilty of misdemeanor child endangerment when "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child." Unlike the California statute at issue in *Fregozo*, § 260.10(1) by its terms criminalizes only conduct that is "likely" to create a physical, mental, or moral injury. In *Florez*, the petitioner did not contest the point; accordingly, we assumed without deciding that the New York statute was coextensive with the federal definition, 779 F.3d at 209, and therefore that the risk envisioned as a predicate to criminal liability was "sufficiently high"—a pivotal phrase whose ambiguity is obvious.

Consequently, we must determine whether, as evidenced by actual prosecutions and convictions, we nonetheless discern a "realistic probability" that New York convicts individuals for conduct generating risks of harm of a likelihood or severity below the federal threshold. *See Hylton v. Sessions*, 897 F.3d 57, 64 (2d Cir. 2018) (realistic probability inquiry necessary where "the elements of the state statute alone do not provide sufficient guidance on its application"). I therefore next address this test, and my objections to the majority's application of it.

### B. The Majority's Application of the "Realistic Probability" Test

As the majority observes, the New York Court of Appeals has ruled that a conviction under § 260.10(1) requires that a defendant have acted "with an awareness of the potential for harm," and "that the harm was likely to occur, and not merely possible." *People v. Hitchcock*, 98 N.Y.2d 586, 590–91 (2002).[6] Matthews and his amici, however, point to numerous New York prosecutions in which the identified risk of harm seems indeed to have been "merely possible." Further, New York courts appear to be divided on the likelihood of harm that the prosecution needs to show to secure a conviction. In my view, these prosecutions and the related convictions demonstrate a "realistic probability" that § 260.10(1), as applied, sweeps more broadly than does the INA's generic definition of a crime of child abuse.

### 1) The "Home Alone" Cases and N.Y. Court Rulings on Motions to Dismiss for Facial Insufficiency

The main category cited by Matthews and amici is the "home alone" cases—in which a defendant is charged with violating § 260.10(1) for having left a child unattended for some period of time. For example, in *People v. Reyes*, a

---

[6] The majority's application of the "realistic probability" test is largely consistent with that of the BIA in *Mendoza Osorio*, 26 I. & N. Dec. 703, where the agency rejected similar arguments raised by the respondent and held that § 260.10(1) was categorically a "crime of child abuse" under the INA. *Id.* at 712. Because the BIA has "no expertise in construing . . . state criminal statutes," however, the majority rightly subjected the BIA's interpretation of § 260.10(1) to *de novo* review. *See Gill v. I.N.S.*, 420 F.3d 82, 89 (2d Cir. 2005). Accordingly, I refer to the majority's conclusions rather than the agency's in this discussion.

defendant was prosecuted for "allegedly leaving her [sleeping] four year old child in an apartment, unsupervised, for at least fifteen minutes." 2008 WL 3010044 at *1, 872 N.Y.S.2d 692 (Crim. Ct. 2008). The defendant moved to dismiss the complaint as facially insufficient as a matter of law, arguing that it did not "allege facts sufficient to provide reasonable cause to believe that the defendant committed the offense charged." *Id.* at *2. The trial court disagreed, expressing the view that "[i]t is reasonable to imagine the wide range of harm that might befall a four year old child left alone [awake] in an apartment," but cautioning at the same time that factual issues such as "the age of the child, the length of time involved, the maturity of the particular child, and the reason why the child was left alone" were "particularly unsuitable for determination on motion, and except in the most extreme cases, are best reserved for trial." *Id.* at *1, *3.

The majority reasonably proposes that, "if [*Reyes*] proceeded to trial, the prosecution would have been put to its burden to convince a jury that the defendant's conduct resulted in a likelihood of harm to her child and that the defendant knew that her conduct was likely to result in injury to her child." Maj. Op. at 30. Therefore, it follows, *Reyes* illustrates that "New York courts are cognizant of the line between 'bad parenting' and child endangerment, and provide prosecutors and juries with guideposts for determining when the factual circumstances of a case establish culpability . . . ." *Id*.

With respect, I must disagree with that conclusion. Although the *Reyes* court's decision to commit the judgment to a jury is understandable, the "guideposts" that the majority sees in *Reyes* strike me as largely illusory. While

13

New York state courts have published dispositions resolving motions to dismiss criminal complaints brought under § 260.10(1), as happened in *Reyes*, the parties have pointed to no judicial statements resolving a sufficiency challenge to a defendant's *conviction* on "home alone" charges under § 260.10(1), and I have identified none. This leaves the actual guideposts available for prosecutors making charging decisions and for defendants making plea decisions in fact encased in fog.

This vagueness persists, but not because New York only rarely prosecutes "home alone" cases under § 260.10(1) or has only recently begun to do so. Numerous New York courts have found criminal misdemeanor complaints under § 260.10(1) facially sufficient for prosecution on facts reminiscent of *Reyes*. *See, e.g.*, *People v. Hot*, 2018 WL 652480, 94 N.Y.S.3d 539 (Crim. Ct. 2018) (toddler left sleeping in car while mother shopped nearby); *People v. Fielden*, 2015 WL 4460568, 18 N.Y.S.3d 581 (Crim. Ct. 2015) (infant left awake in hotel room for one hour); *People v. Eury*, 2015 WL 135097, 7 N.Y.S.3d 244 (Crim. Ct. 2015) (four or five children aged under ten left alone, with four asleep, in apartment, for at least 40 minutes); *People v. Gulab*, 2009 WL 1309785, 886 N.Y.S.2d 68 (Crim. Ct. 2009) (two children ages five and ten home alone for two hours); *People v. Fraser*, 2008 WL 4866334, 875 N.Y.S.2d 822 (Crim. Ct. 2008) (security officer saw infant child in stroller in an apartment building hallway; defendant stated that she was "down the hall watching"); *People v. Watson*, 700 N.Y.S.2d 651, 655 (Crim. Ct. 1999) (seven-year-old child home alone awake for two-and-a-half hours).[7] As

---

[7] Worthy of observation in connection with VAWA, with the sole exception of *Watson*, only women were charged in these "home alone" cases.

long ago as in 1997, in *People v. Cenat*, 671 N.Y.S.2d 578, 580 & n.2 (Crim. Ct. 1997), a New York trial court observed that "[o]ver the past few years the Criminal Court has seen a flood of cases charging Endangering the Welfare of a Child for leaving children of various ages 'home alone'" and reported at the time that "[t]here are over 200 [child endangerment] cases pending currently, a substantial number of which allege 'home alone' type allegations."

Despite the apparent frequency of prosecutions in "home alone" cases over an extended period, New York courts continue to express a range of inconsistent judicial views about legal sufficiency. *See Eury*, 2015 WL 135097 at *3 ("[E]ven the simple question of whether [an] allegation that the defendant left a child or children alone for a time—without any aggravating circumstance—is sufficient has produced conflicting results."); *Watson*, 700 N.Y.S.2d at 655 (recognizing a "divergence in judicial views on the matter"). Matthews and amici provide a compelling and plausible explanation for the persistent haziness: such cases are overwhelmingly unlikely to go to trial (and, consequently, even less likely to present a sufficiency challenge for appellate review). For example, according to the New York State Division of Criminal Justice Services, and as reflected in the attached chart, in 2008—the year that *Reyes* was decided—4,851 people in the State were arrested for violating § 260.10(1). Approximately 33% of

15

the resulting prosecutions were dismissed.[8] Of the remaining cases, approximately 80% were resolved by guilty plea.[9] Only forty-two people (approximately 1.3% of those whose cases were *not* dismissed) went to trial. Of these forty-two, twenty were convicted and twenty-two were acquitted. Put another way: of convictions obtained under § 260.10(1) in the year 2008, *over 99%* were obtained by guilty plea, resulting in no articulation at all of any "guideposts."

The reported data are similar for the other years in the dataset, which covers from 1990 through 2015.[10] The available statistics regarding these prosecutions thus suggest that, unless the complaint is dismissed as facially insufficient, defendants in a § 260.10(1) prosecution go to trial in about 1% of cases and will in approximately 80% of cases plead guilty to the charge, with no judicial articulation of any limits on their misdemeanor crimes.

---

[8] The Government has not contested the accuracy of the statistics presented by amici, which amici advise were obtained by amicus Immigrant Defense Project from the New York State government pursuant to a request for information under New York's Freedom of Information Law. Amici Br. 23 n.8. I see no reason why they should not be subject to judicial notice. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

[9] These numbers do not add up to 100% because 359 cases remained open without disposition; 132 cases were not prosecuted; and 148 cases in the chart were simply labeled "other," without further specification.

[10] The full database cited by *amici* is available at https://www.immigrantdefenseproject.org/wp-content/uploads/2016/06/DCJS-EWOC-data-arrs-dispos-sents.pdf (last accessed June 3, 2019).

These dramatic figures should not be surprising, even apart from the well-known frequency of plea bargains in the criminal justice system: the data further show that, in prosecutions under § 260.10(1) from 2000 to 2015, less than 20% of convictions resulted in any term of imprisonment at all; 43% of convictions led only to probation or a fine; and over 35% of convictions resulted in what the state calls a "conditional discharge," meaning a non-carceral sentence to which certain conditions are attached. Amici Br. 10. Significant here, by statute, a "conditional discharge" embodies a judicial finding that "neither the public interest nor the ends of justice would be served by a sentence of imprisonment" or even by probation. NYPL § 65.05(1)(a). When, in over one-third of prosecutions brought under the statute, the sentence for pleading guilty is of this type (and is understood to bear no immigration consequences), a defendant has little incentive to contest the charges or proceed to trial.

Despite these data, the majority's approach appears to require Matthews to show that a § 260.10(1) defendant charged with conduct outside the INA's generic definition could be convicted at trial *and* have his conviction upheld on appellate review. Absent that appellate statement, the construction of the statute that underlies his conviction has little import, the reasoning would go.

This approach is certainly defensible as a formal matter: after all, the New York state courts, not its prosecutors (or the local federal courts), have the final word on the correct construction of New York laws. But the Supreme Court has never described the "realistic probability" test in these terms, nor in my estimation does it make sense to require such a showing here. Rather, in *Duenas-*

17

*Alvarez*, the Court required only a showing that "the State *would apply* its statute to conduct that falls outside the generic definition." 549 U.S. at 193 (emphasis added). More recently, in *Moncrieffe*, the Court required a showing that "the State *actually prosecutes* the relevant offense" in a fashion that is inconsistent with the generic offense. 569 U.S. at 206 (emphasis added). To import into the Court's "realistic probability" test a requirement that the state appellate courts describe the farthest contours of the state law's application strikes me as both unworkable and inappropriate, particularly in the context of a misdemeanor crime, and where (as here) courts are unlikely ever to have the opportunity to do so. An approach that by definition focuses on only the 0.8% of convictions that are secured following a jury trial (and the even smaller percentage that are subsequently upheld on appellate review) will necessarily fail to grasp "the elements of the offense in practice." *Whyte v. Lynch*, 807 F.3d 463, 469 (1st Cir. 2015).

The Supreme Court has not as yet applied, and we are rarely, if ever, called upon to apply the "realistic probability" test to misdemeanor statutes that criminalize conduct that is punished so leniently as the mine-run of prosecutions under § 260.10(1). But because the analysis that we undertake requires us to identify "the least of the acts criminalized under the state statute," *Mellouli v. Lynch*, 135 S. Ct. 1980, 1986 (2015) (internal quotation marks omitted), and because the immigration consequences will be so severe, we must examine all available and reliable evidence regarding related convictions to ensure the accuracy of the New York endangerment statute's asserted match with the generic federal definition.

If the allegations in *Reyes*, discussed above, were deemed sufficient to survive a motion to dismiss, the case suggests that some defendants (indeed, based on the statistical evidence before us, possibly many defendants) have pleaded guilty to similar offense conduct. The only remaining question, then, is whether the conduct alleged in *Reyes* and similar "home alone" cases more closely approximates conduct creating the "sufficiently high risk of harm to a child" we required in *Florez* or the "bare potential for nonserious harm" described by the Ninth Circuit in *Fregozo* and distinguished by the BIA in *Mendoza Osorio*, 26 I. & N. Dec. at 711. Even drawing all factual inferences in favor of the prosecution in these cases, in my view the nature of the allegations presented and the judicial comments elicited seem far more consistent with the speculative "may be endangered" standard found wanting in *Fregozo* (or the "conduct that could threaten a child's welfare" found similarly insufficient by the Third Circuit in *Liao*, 910 F.3d at 722), than the "sufficiently high risk of harm to a child" that we demanded in *Florez*.[11]

---

[11] Tending to reinforce this conclusion, New York courts have accepted remarkably slim "risk of harm" showings in some § 260.10(1) prosecutions. For example, in *People v. Simmons*, 92 N.Y.2d 829 (1998), the New York Court of Appeals upheld the endangerment conviction of a child care worker who "repeatedly direct[ed] vulgar remarks of a sexual nature" at a two-year-old child. *Id.* at 830. On appeal, the defendant challenged the scant record evidence regarding the likelihood of harm inflicted on the child. Rejecting that challenge, the court explained that, "regardless of the child's current level of understanding," the jury needed no evidence on the issue of harm, but could rely on its "common human experience and commonsense understanding of the nature of children" to conclude that the remarks were "likely to have caused the child harm, and that defendant knew that her remarks were likely to cause the child to suffer harm." *Id.* at 831.

For these reasons, I conclude that Matthews has carried his burden of showing a "realistic probability" that New York prosecutes conduct under § 260.10(1) that falls outside the INA's generic definition of child abuse. I would grant his petition for review on this basis.

## 2) Import of the Charging Documents Presented by *Amici*

In similar vein, Matthews's amici have presented several arrest reports, complaints, and misdemeanor informations—the authenticity of which the Government does not contest—as reflecting New York State decisions to charge various individuals with state child endangerment misdemeanor violations for conduct such as: (1) driving with a suspended license while a minor child is in the car (Amici App. 2); (2) "yell[ing] and swing[ing] his backpack" in a store and knocking objects off shelves, thereby injuring a child (Amici App. 9–10); and (3)

---

Judge Titone observed in dissent that the prosecution itself had "put forth proof that the young girl here did not understand appellant's lewd questions," and opined that the jury had "no evidentiary basis . . . to conclude that the young girl would likely be harmed"; rather, the "evidence pointed only to the conclusion that the child here was nothing more than a baby who was capable of mouthing the words 'yes, yes' but said this to 'everything' regardless of context or content." *Id.* at 832 (Titone, *J.*, dissenting).

In my view, the *Simmons* decision and cases of this ilk provide another persuasive indication that state prosecutors apply NYPL § 260.10(1) outside the generic federal definition.

shoplifting while accompanied by children (Amici App. 12, 14, 16).[12] None of the charged conduct is commendable, to be sure, and under the "moral welfare" portion of the New York statute, prosecution may have been justifiable.

But the majority's position must be that, absent any evidence that the allegations in the charging documents ever led to convictions or were upheld by state courts as facially sufficient, these documents, too, do not suggest that individuals in New York have a "realistic probability" of conviction under § 260.10(1) for conduct falling outside the INA's generic definition of "child abuse." *See* Maj. Op. at 32–34. Such documents alone may not be sufficient to carry Matthews's burden, it is fair to say. But the broad range of conduct that they reflect as warranting state criminal charges further suggests that the statute

---

[12] The majority accepts the government's argument that we should not consider these charging documents because Matthews did not introduce them into the administrative record below. *See* 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based."). But introducing such documents into the record below would have been futile. By the time Matthews was ordered removed by the Immigration Judge in April 2016 based on his two aged § 260.10(1) convictions, the BIA had already decided in *Mendoza Osorio* that the New York statute was categorically a crime of child abuse. And in *Mendoza Osorio*—a decision that we did not have the opportunity to review directly—the BIA was presented with, and refused to consider, similar charging documents. 26 I. & N. Dec. at 707 n.4. Although they were not incorporated into the administrative record, I see no unfairness or impropriety in considering their implications. The BIA was familiar with this public record evidence from the proceedings in the context of its *Mendoza Osorio* decision, and the documents do not concern factual matters on which credibility was an issue or testimony appropriate.

has been used to charge conduct less than the generic INA definition of a crime of child abuse.[13]

In sum, the charging documents adduced by amici illustrate further that, in addition to the "home alone" cases discussed above, New York State pursues prosecutions and secures convictions under § 260.10(1) in situations that, while doing no credit to the individuals convicted, "'creat[e] only the bare potential for nonserious harm to a child.'" *Mendoza Osorio*, 26 I. & N. Dec. at 711 (quoting *Fregozo*, 576 F.3d at 1038). This, too, reinforces the conclusion that Matthews has demonstrated a "realistic probability" that the statute is more broadly applied than the INA offense.

## II.

Beyond its unduly constrained analysis of the realities of NYPL § 260.10(1), the BIA's holding that Matthews is removable suffers from another troubling flaw. The agency's determination to apply its categorical equation of New York child endangerment with the INA definition of "child abuse" *retroactively* to Matthews and to others, newly rendering them deportable, can be expected to have a devastating effect on those who pleaded guilty to the New York

---

[13] Although it did not survive appellate review, one particular reported conviction also tends to confirm the impression created by amici's submissions that the statute is charged broadly and on occasion idiosyncratically. In this odd case, a horse-farm owner was convicted after a bench trial of violating § 260.10(1) "after she injected a dog with a tranquilizer in the presence of a child." *People v. Kanciper*, 954 N.Y.S.2d 146, 147 (2d Dep't 2012). The case history demonstrates that a prosecutor may charge (and secure the conviction of) an individual on allegations where the harm to the child is highly speculative.

misdemeanor years ago, understanding then that the likely consequence would be only probation or conditional discharge. The parties did not pursue the implications of this observation in their briefs on appeal here. But the agency has not proposed that its equation of New York law and the INA's generic definition has only prospective force, and its actions with regard to Matthews surely demonstrate the contrary.

We recently re-affirmed the following statement of five factors that we "weigh . . . to determine whether an agency may apply a new rule retroactively":

> (1) whether the case is one of first impression, (2) whether the new rule presents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order places on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Obeya v. Sessions*, 884 F.3d 442, 445 (2d Cir. 2018) (quoting *Lugo v. Holder*, 783 F.3d 119, 121 (2d Cir. 2015)). In *Obeya*, we also clarified that, "when conducting retroactivity analysis in the immigration context, we look to whether it would have been reasonable for a criminal defendant to rely on the immigration rules in effect at the time that he or she entered a guilty plea." *Id.* at 448; *see also Velasquez-Garcia v. Holder*, 760 F.3d 571, 582 (7th Cir. 2014) (applying similar retroactivity analysis). In the case of individuals who entered guilty pleas in New York under § 260.10(1) before today—and especially those who did so before *Soram* was decided—it is easy to conclude that they could have reasonably relied on the

"immigration rules in effect at the time," in *Obeya's* phrase, and expected no immigration consequences at all from their guilty plea to misdemeanor child endangerment that garnered a sentence of probation or conditional discharge.

Here, as in *Obeya*, the first and fourth *Lugo* factors "are not seriously at issue in the case before us"; both favor Matthews. 884 F.3d at 445. As set forth in Part I, the interpretation of the INA's generic definition of "child abuse" is not a matter of first impression for the BIA, and the burden of retroactive application—removal from the United States—is drastic. Accordingly, here, also as in *Obeya*, the "heart of this case rests with the second and third *Lugo* factors," that is, whether *Soram* (and *Mendoza Osorio*) marked "abrupt departure[s]" from the BIA's "well-established practice," and whether Matthews reasonably relied on the "former rule." *Id.*

Between 1999 and 2008, as observed in Part I, the BIA's sole statement concerning the generic federal definition was that it encompassed "[a]ny form of cruelty to a child's physical, moral or mental well-being." *Rodriguez-Rodriguez*, 22 I. & N. Dec. at 996; *see also Velazquez-Herrera v. Gonzales*, 466 F.3d 781, 783 (9th Cir. 2006) ("The source *Rodriguez-Rodriguez* consulted, Black's Law Dictionary 405 (8th ed. 2004), defines 'cruelty' as '[t]he intentional and malicious infliction of mental or physical suffering on a living creature.'"). Then, in 2008, the BIA lowered the requisite *mens rea* to criminal negligence. *See Velazquez-Herrera*, 24 I. & N. Dec. at 511–12 n.13 (repudiating *Rodriguez-Rodriguez*'s reliance on Black's Law Dictionary's definition of "cruelty," and holding that under "the weight of Federal and State authority in effect in 1996 . . . criminally negligent acts

24

sufficed"). But even *Velazquez-Herrera* retained the suggestion that "the infliction on a child of . . . harm, even if slight" was a necessary element of the generic offense. *Id.* at 512. Only in 2010, in *Soram*, did the BIA finally state its current view that "actual harm or injury to the child" was not required as an element of the generic crime. 25 I. & N. Dec. at 381.

In this context, where the BIA has materially changed its interpretation of the generic offense, the second *Lugo* factor—whether there has been an "abrupt departure"—weighs in favor of Matthews. Consequently, because "[t]here can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions," *INS v. St. Cyr*, 533 U.S. 289, 322 (2001), the third *Lugo* factor favors Matthews as well. It is fair, then, to conclude that Matthews's 2002 and 2003 convictions should not render him deportable under the contemporaneous BIA interpretation, on which he could have reasonably relied.

Accordingly, even if I agreed with the merits of the BIA's recent alignment of § 260.10(1) and the generic federal definition, I would still hold that, under *Obeya* and *Lugo*, this rule could not be applied retroactively to Matthews and those similarly situated. I would grant his petition for review on this ground as well. The majority does not address this question and its opinion should not foreclose other individuals from challenging the BIA's retroactive application of its definition to them.

## III.

Even apart from retroactivity concerns, the implications of the BIA's interpretation of § 260.10(1) that the majority affirms here today reach well beyond Matthews's case. In addition to being at odds with the "realistic probability" analysis, the holding leads to harsh results that I believe are unlikely to have been intended by Congress.

As the BIA recounted in *Matter of Velazquez-Herrera*, when passing the statute that added "a crime of child abuse, child neglect, or child abandonment" to the list of offenses rendering an individual deportable, Congress "clearly intended to single out those who have been convicted of maltreating or preying upon children." 24 I. & N. Dec. at 509. We have been alerted to no basis for concluding that, in so doing, Congress *also* intended to render deportable parents who, in a possible violation of a state child endangerment statute and in a display of bad judgment, leave their child alone briefly, commit minor offenses in the presence of a child, or engage in other conduct that might allow for the possibility of relatively minor harm befalling a child. Surely such acts fall outside of the general understanding of "child abuse," even broadly interpreted.

Indeed, the BIA has adduced no evidence that Congress (in enacting 8 U.S.C. § 1227(a)(2)(E)(i)), the New York legislature (in enacting § 260.10(1)), or the New York judiciary (in leniently sentencing § 260.10(1) violations) desired or even recognized that permanent family separation could be triggered by such lapses in judgment in childrearing, as blameworthy as they may be. *See Martinez-Cedillo*, 896 F.3d at 1002 (Wardlaw, *J.*, dissenting) ("It should not be lost on us

26

that, while we fault [Respondent] for endangering his son, we simultaneously condone the separation of a family, exiling a father of two children who has resided in the United States lawfully for more than twenty-five years. That Congress did not intend such a result is apparent from these facts.").[14]

Paradoxically, it is children who will suffer harm under the agency's interpretation of § 260.10(1)—a law intended for their protection. In addition to subjecting lawful permanent residents to deportation, under the agency's rule, *non*-permanent residents become not only removable but also statutorily ineligible for cancellation of removal because of such a conviction. *See* 8 U.S.C. § 1229b(b)(1)(C) (excluding aliens "convicted of an offense under section . . . 1227(a)(2)" from such relief). Even in cases where a non-permanent resident can otherwise prove that removal would result in *exceptional and extremely unusual hardship* to U.S. citizen or lawfully resident children, the agency's position, affirmed by the majority, will compel the immigration courts to deny them relief. *See id.* § 1229b(b)(1)(D); *Matter of Monreal*, 23 I. & N. Dec. 56, 62 (BIA 2001) (to qualify for such relief, "the hardship to an alien's [children], if the alien is obliged to leave the United States, must be 'substantially' beyond the ordinary hardship that would be expected when a close family member leaves this country"). It requires no exercise of judicial imagination to conclude that a child will be harmed by being separated from a parent, who, even if imperfect, is generally competent and caring.

---

[14] *See* note 5, *supra*, for *Martinez-Cedillo*'s subsequent appellate history.

I am also concerned that another vulnerable group will be harmed by this result as well—victims of domestic violence. Under the BIA's interpretation, a conviction under § 260.10(1) will also render a noncitizen ineligible for cancellation of removal under the "battered spouse or child" provisions of VAWA. *See* 8 U.S.C. § 1229b(b)(2)(A)(iv) (excluding individuals deportable under "paragraphs . . . (2) through (4) of section 1227(a)" from relief). This provision allows an immigration court, subject to certain conditions, to grant cancellation of removal to individuals who have been "battered or subjected to extreme cruelty" by a spouse who is a U.S. citizen or lawful permanent resident. *Id.* § 1229b(b)(2)(A). The statute's text and legislative history offer strong signals that Congress intended VAWA's immigration-related provisions to serve as a safety valve aimed at preventing victims of domestic violence who depend on a spouse for immigration status from becoming trapped in violent relationships.[15] It seems extremely unlikely that Congress intended that domestic violence victims previously convicted of a minor child endangerment misdemeanor be barred

---

[15] The Report of the House Committee on the Judiciary accompanying the legislation explained:

> Domestic battery problems can become terribly exacerbated in marriages where one spouse is not a citizen, and the non-citizen[']s legal status depends on his or her marriage to the abuser. Current law fosters domestic violence in such situations by placing full and complete control of the alien spouse's ability to gain permanent legal status in the hands of the citizen or lawful permanent resident spouse. . . . Consequently, a battered spouse may be deterred from taking action to protect himself or herself, such as filing for a civil protection order, filing criminal charges, or calling the police, because of the threat or fear of deportation.

H. R. Rep. 103-395 at 26, 1993 WL 484760 (1993).

from relief when it created VAWA's immigration-related remedies, years before the BIA's definition of a crime of "child abuse, child neglect, or child abandonment" expanded in *Soram*, in 2010, to reach its current capacious state.

In sum, the majority affirms an agency ruling that inflicts an array of troubling collateral consequences on a broad class of non-citizens. That Congress so intended, *sub silentio,* by making a crime of "child abuse" a removable offense strikes me as implausible. These considerations, too, support the conclusion reached in Parts I and II that Matthews's petition for review should be granted.

\* \* \*

Our country's immigration laws address the tension between promoting public safety by removing non-citizens who have violated our criminal laws in a domestic setting, on one hand, and pursuing the "underlying intention . . . regarding the preservation of the family unit," *Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (quoting H.R. Rep. No. 82-1365 (1952)), on the other. We have acknowledged that one of the law's goals is "to keep families intact where possible." *Nwozuzu*, 726 F.3d at 332; *see also Ibarra v. Holder*, 736 F.3d 903, 918 n.20 (10th Cir. 2013) (declining to defer to the BIA's ruling in *Soram* and declaring, "[O]ne of the purposes of the INA is 'keeping families of United States citizens and immigrants united,' not just deporting people." (internal citation omitted)).

In its incorrect ruling that New York misdemeanor child endangerment law is equivalent to the INA's generic definition of child abuse, the BIA ignores the real-world application of the New York statute. It also averts its eyes from the

29

real-world effect of its decision: the needless and potentially permanent separation of children from their parents. Retroactive application of the agency's ruling will run afoul of the principles that we established in *Lugo* and *Obeya*. Its prospective application will inflict needless suffering on some of the most vulnerable members of our society.

For these reasons, I respectfully dissent.

# NEW YORK STATE ARRESTS FOR PL 260.10 SUB 1 AND DISPOSITIONS/SENTENCES

| County | | Arrest Year | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* |
| New York State | Total Arrests | 1484 | 1787 | 2077 | 2186 | 2505 | 3000 | 3703 | 4079 | 4459 | 4510 | 4615 | 4730 | 4827 | 4563 | 4463 | 4634 | 4793 | 4765 | 4851 | 5123 | 4946 | 4890 | 4905 | 4836 | 4468 | 2392 |
| | Open-No Dispo Reported | 83 | 146 | 152 | 103 | 138 | 156 | 182 | 207 | 190 | 180 | 344 | 336 | 360 | 350 | 374 | 337 | 339 | 301 | 359 | 379 | 408 | 477 | 520 | 646 | 1403 | 1791 |
| | Convicted-Verdict | 6 | 12 | 18 | 4 | 16 | 17 | 17 | 24 | 28 | 29 | 22 | 25 | 27 | 22 | 27 | 14 | 20 | 25 | 20 | 34 | 19 | 12 | 14 | 15 | 6 | 0 |
| | Convicted-Plea | 737 | 858 | 1019 | 1122 | 1349 | 1573 | 2067 | 2160 | 2476 | 2510 | 2469 | 2500 | 2714 | 2489 | 2422 | 2509 | 2522 | 2594 | 2584 | 2753 | 2539 | 2415 | 2560 | 2394 | 1889 | 398 |
| | Dismissed | 589 | 686 | 775 | 869 | 852 | 1099 | 1255 | 1478 | 1523 | 1536 | 1551 | 1618 | 1472 | 1459 | 1392 | 1519 | 1622 | 1538 | 1586 | 1630 | 1664 | 1624 | 1468 | 1498 | 912 | 123 |
| | Acquitted | 5 | 9 | 8 | 11 | 14 | 11 | 10 | 15 | 15 | 21 | 13 | 18 | 14 | 20 | 14 | 14 | 17 | 23 | 22 | 15 | 13 | 17 | 11 | 7 | 8 | 2 |
| | Not Prosecuted | 22 | 13 | 33 | 19 | 48 | 61 | 61 | 77 | 89 | 84 | 85 | 102 | 86 | 80 | 100 | 102 | 124 | 127 | 132 | 143 | 146 | 174 | 123 | 126 | 113 | 57 |
| | Other | 42 | 63 | 72 | 58 | 88 | 83 | 111 | 118 | 138 | 150 | 131 | 131 | 154 | 143 | 134 | 139 | 149 | 157 | 148 | 169 | 157 | 171 | 209 | 150 | 137 | 21 |
| | Prison | 3 | 2 | 1 | 0 | 5 | 4 | 5 | 6 | 5 | 10 | 12 | 8 | 10 | 5 | 9 | 11 | 2 | 7 | 11 | 7 | 6 | 4 | 6 | 5 | 2 | 0 |
| | Time Served | 48 | 40 | 40 | 55 | 55 | 78 | 98 | 95 | 113 | 90 | 111 | 143 | 117 | 139 | 101 | 102 | 117 | 110 | 124 | 120 | 120 | 117 | 122 | 149 | 111 | 36 |
| | Jail | 92 | 96 | 125 | 123 | 166 | 190 | 265 | 285 | 275 | 285 | 267 | 275 | 294 | 248 | 286 | 307 | 310 | 343 | 337 | 373 | 323 | 303 | 370 | 328 | 226 | 56 |
| | Jail+Probation | 27 | 20 | 30 | 24 | 40 | 42 | 51 | 69 | 73 | 73 | 51 | 54 | 77 | 61 | 68 | 55 | 68 | 52 | 69 | 66 | 64 | 43 | 45 | 46 | 25 | 4 |
| | Probation | 115 | 135 | 184 | 191 | 203 | 247 | 343 | 338 | 366 | 374 | 386 | 344 | 385 | 366 | 360 | 347 | 361 | 294 | 297 | 317 | 279 | 236 | 270 | 216 | 185 | 27 |
| | Fine | 239 | 263 | 322 | 329 | 409 | 497 | 633 | 677 | 834 | 899 | 819 | 881 | 930 | 895 | 782 | 826 | 768 | 820 | 797 | 816 | 704 | 723 | 745 | 654 | 525 | 107 |
| | Cond Discharge | 212 | 307 | 328 | 393 | 467 | 514 | 659 | 685 | 817 | 780 | 829 | 800 | 907 | 766 | 813 | 843 | 868 | 942 | 922 | 1031 | 1017 | 957 | 962 | 984 | 796 | 166 |
| | Other | 7 | 7 | 7 | 11 | 20 | 18 | 30 | 30 | 21 | 28 | 16 | 20 | 21 | 31 | 30 | 32 | 48 | 51 | 47 | 57 | 45 | 44 | 54 | 27 | 25 | 2 |

*as of 7/21/2015.
Note: A few arrests occurred outside of New York State; those are included in the total but not shown separately.
Includes arrest events where PL 260.10sub1 was either the only or most serious charge at arrest.
Based on arrest year, and the disposition may have occurred in a subsequent year.
The convictions shown include plea bargains to other charges. Prison sentences could only result if the charge was elevated to a felony after arrest.

Source: DCJS, Computerized Criminal History system